IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2019 Session

## STATE OF TENNESSEE v. DEREK WYCHE

**Appeal from the Criminal Court for Davidson County**
**No. 2015-C-2231     Monte Watkins, Judge**

_____

### No. M2018-01586-CCA-R3-CD

_____

The Defendant-Appellant, Derek Wyche, was convicted by a Davidson County jury of felony murder and especially aggravated robbery, for which he received a mandatory life sentence plus twenty years' imprisonment.  In this appeal as of right, the Defendant challenges the sufficiency of the evidence in support of his convictions and the trial court's imposition of consecutive sentencing.  Upon our review, the convictions of the trial court are affirmed.  However, we remand this matter for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part; Remanded for Sentencing**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the Defendant-Appellant, Derek Wyche.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case involves a 1999 robbery of a movie theater during which the manager, Heather Finney, was shot, and the security guard, Brandon Brewer, was shot and killed. Eighteen years later, the Defendant was developed as a suspect, admitted to his involvement, and charged with the instant offenses.  In his recorded statement and at trial, the Defendant claimed that he was forced to participate in the instant offense because Keith Henry, his co-defendant, threatened to kill him and his family if he failed to do so. The following proof was adduced at the April 10-12, 2018 trial.

On October 3, 1999, the day of the offense, Heather Finney had been employed with Regal Entertainment Group as a general manager and was responsible for operations, money, deposits, payroll, and film bookings at a movie theater in Hermitage, Tennessee. Prior to going to the bank for the nightly cash deposit, Finney walked through the theater to ensure no one was there, set the alarm, and began to lock up. She was escorted by a security guard, Brandon Brewer, who was in uniform and armed with a gun. As they were locking the door to the theater, two men approached them with guns. Finney was certain it was a robbery when one of the men said, "give me the money." The men were approximately six feet away from Finney, and neither man wore a mask. Finney dropped the bank bag of money on the ground and kicked it toward the men. At this point, Brewer was standing behind Finney, and Finney heard "the first shot." Finney then heard another gunshot and realized she had been shot in the arm. She fell to the ground and played "like she was dead." Finney said the time between the first and second gunshots was "very short" or "immediately after" the first gunshot that struck Brewer.

As Finney was on the ground, she heard the two men walk away. She looked at Brewer and observed that he "was probably not going to make it." Finney then went back inside the theater and called the police. Finney did not know which man shot her, but she was certain that she saw a gun that night. Following the police arrival, Finney was taken to the hospital where she stayed for approximately three days. Finney had to undergo physical therapy, and the doctors were unable remove the bullet from her chest. Finney explained that the bullet "chipped" her shoulder and lodged in her chest. An x-ray showing the location of the bullet in Finney's chest cavity was admitted as an exhibit at trial.

Finney could not recall a specific description of the perpetrators other than both were male, black, and wore dark clothes. She also could not recall the exact amount of money that was inside the bag, but she estimated that it was "a few thousand . . . seven to eight-ish, twelve-thousand" dollars. She testified that the theater did not have internal or external video surveillance at that time. On July 8, 2015, Finney was shown a photographic array of individuals by Detective Satterfield, and she circled a photograph of the Defendant because of the "shape of his face[.]" However, at trial, Finney was unable to identify the Defendant as one of the perpetrators of the offense. On cross-examination, Finney confirmed that she heard only one voice demand the money and that this was the only statement she heard during the robbery. Finney also confirmed that she observed only one gun; however, she was unsure whether it was the gun that shot her or Brandon Brewer.

Upon his arrival to the scene, Officer George Bouton, a crime scene investigator with the Metro Nashville Police Department (MNPD) at the time of the offense, observed

that Brandon Brewer, deceased, and Finney were present and that the area was secured with crime scene tape. Officer Bouton took photographs of the area, which were admitted as a collective exhibit at trial. Officer Bouton also identified certain items that were collected from the crime scene including a 9-millimeter fired cartridge casing, a .380 fired cartridge casing and projectile, another spent cartridge casing, and a blue shirt worn by Finney during the offense, all of which were admitted as exhibits at trial. Officer Bouton testified that he temporarily took possession of Brandon Brewer's gun, which was located on his person in its holster, before returning it to Brewer's employer.

At the time of the offense, Detective Kent McAllister was assigned to the "Murder Squad" or what is now known as the MNPD Cold Case Unit. Detective McAllister responded to the scene and observed the lifeless body of Brandon Brewer with his weapon strapped in his holster. It was later determined that Brewer's weapon had not been fired that night because it did not have a round in the chamber. Detective McAllister observed two different types of shell casings on the scene, which indicated that two different guns had been fired during the offense. There was never a weapon recovered connected to the offense, and the three red bank bags with "Old Dominion" written on them taken from the scene were also never recovered. At some point in 2000, after speaking with Keith Henry, Detective McAllister interviewed the Defendant while he was incarcerated in Plainfield, New Jersey. During that discussion, the Defendant did not "mention anything … about being forced to commit" the instant offense. However, Detective McAllister testified that the Defendant did admit to committing the crime at that time. Detective McAllister prepared his case files and forwarded the information to the District Attorney's office. Although the matter remained an "active open case," nothing was done with it. Detective McAllister testified that he solicited leads through Crime Stoppers, but the caliber of the weapons used in the offense was not disclosed.

On cross-examination, Detective McAllister confirmed, based on a Tennessee Bureau of Investigation (TBI) report, that there was a bullet that exited the body of Brandon Brewer that matched the shell casing on the scene. Detective McAllister also stated that there was $2300 in each bank bag, for a total of $6900.

Danny Satterfield, a 25-year veteran police officer of MNPD, testified that he was also assigned to the "Murder Squad" at the time of the offense. He was "familiar" with the statement made by the Defendant back in 2000, and he explained that the case was not prosecuted "due to the circumstances surrounding the statement." Officer Satterfield continued to investigate the case, and sometime later, he arranged to speak with the Defendant again. Officer Satterfield called the Defendant, advised him that he wanted to talk with him about "a situation that happened . . . in Nashville when he was here[,]" and believed the Defendant understood what he was talking about. The Defendant agreed to speak with Officer Satterfield. On August 26, 2015, Officer Satterfield met the

Defendant in Newark, New Jersey, at a government building to conduct a recorded interview. The Defendant was not in custody, and he was accompanied by a close friend during the interview. A CD of the interview was admitted into evidence and played for the jury at trial. The jury was also provided with a transcript of the CD, as an aid at trial.

Although Dr. Bruce Levy performed the October 3, 1999 autopsy on the victim, Brandon Brewer, Dr. Thomas Deering, an expert in forensic pathology, testified at trial regarding the cause and manner of the victim's death. Dr. Deering reviewed the autopsy report and concluded that the cause of death was a gunshot wound to the head and the manner of death was homicide. The autopsy report, admitted as an exhibit, also showed the existence of stippling which indicated that the "end of the barrel to the [victim's] skin" was between "a half a foot and two feet away."

The Defendant, Derek Wyche, testified on his own behalf. He explained the circumstances leading up to the instant offense. In 1999, he came to Nashville from New Jersey based on Keith Henry's "promise of legal employment" at a modeling agency. Henry paid for the Defendant's airfare and Henry, along with his purported wife "Victoria," picked up the Defendant from the airport. The first thing the Defendant remembered was Henry talking about a robbery of a mother and daughter at a check cashing place in Georgia during which Henry shot and killed the daughter. The Defendant said Henry's wife was photographed as a suspect in a newspaper clipping of the crime. That night or the next day, the Defendant realized there was no legitimate employment offer and Henry was making his living through robberies. Although the Defendant told Henry that he wanted to return home, Henry told the Defendant that "the only way you get back is you gonna have to do this job," referring to the robbery of the theater. The Defendant testified that Henry wanted the Defendant to "give him a body to prove [the Defendant's] loyalty." The Defendant testified that he feared for his life, and that he felt trapped in Nashville because he did not have any money and he did not know anyone.

On the night of the offense, Henry exited the car and gave the Defendant a gun. The Defendant testified that he had never done anything like that before and that Henry had not told him he planned on shooting the security guard. The Defendant explained that when Henry shot the guard, Henry gave the Defendant a look. In response, the Defendant shot Finney in the shoulder in hopes that he did not hit anything vital. The Defendant ran back to the car with Henry and left the scene. He received between $2,000 or $3,000 from the robbery. The Defendant testified that Henry eventually allowed him to return home to New Jersey. He insisted that he would not have participated in the offense but for his fear that Henry would kill him and his family.

Based on the above proof, the jury convicted the Defendant as charged.  On June 5, 2018, the trial court conducted a sentencing hearing, during which the pre-sentence report was admitted as an exhibit.  After considering argument of counsel, the trial court imposed a consecutive term of life imprisonment for the felony murder and twenty years' imprisonment for the especially aggravated robbery.  At the top of its sentencing determination, the trial court stated as follows, "confinement is necessary to avoid depreciating the seriousness of the offense and confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses."  Following consideration of enhancement and mitigating factors, the trial court additionally stated,

> even if the Court didn't consider the defendant a dangerous offender, the actual life sentence is one that would keep him incarcerated for the rest of his natural life anyway, but the Court has to point out that it is necessary to protect the public against further criminal conduction [sic] by the defendant and that the consecutive sentence reasonably relates to the seriousness of the offenses[.]

The Defendant filed a motion for new trial which was subsequently denied by the trial court.  After filing a timely notice of appeal, this case is now properly before this court.

## ANALYSIS

The Defendant's argument challenging the sufficiency of the evidence focuses solely on his defense of duress.  He insists that the defense of duress "was properly raised and established by the proof" at trial and that the State failed to rebut it pursuant to State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994).  In response, the State contends that the jury was entitled to reject and discredit the Defendant's testimony in support of his defense theory of duress, and as such, the evidence is sufficient to support his convictions.  We agree with the State.

We are guided by the following well-established principle of law in resolving this issue.  "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).  "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).  When this court evaluates the sufficiency of the evidence on appeal, the State is entitled

to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Duress is one of the general defenses codified in Part 5 of Chapter 11, Title 39 of the Tennessee Code Annotated; specifically, section 39-11-504 provides:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.
>
> (b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

The Sentencing Commission Comments to this section advise that the duress defense requires that the offense must be committed because another person threatens death or

- 6 -

serious bodily injury if the offense is not committed.  Id., Sentencing Comm'n. Cmts. Additionally, there must be no reasonable means to escape the compulsion to commit the offense.  Id.; see also State v. Robinson, 622 S.W.2d 62, 73 (Tenn. Crim. App. 1980).

Because it is not an affirmative defense, a defendant need not prove duress by a preponderance of the evidence in order to merit a jury instruction.  State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994).  Instead, if the evidence fairly raises its applicability, the trial court is required to submit the defense to the jury, "and the prosecution must 'prove beyond a reasonable doubt that the defense does not apply.'"  Id. (quoting State v. Hood, 868 S.W.2d 744 (Tenn. Crim. App. 1993)).  If the jury retains any reasonable doubt about the applicability of the defense, it must acquit the defendant of the relevant charge.  Bledsoe, 226 S.W.3d at 355 (citing Tenn. Code Ann. § 39-11-203(d)).

Viewing the evidence in the light most favorable to the State, there was sufficient evidence upon which a reasonable jury could convict the Defendant of the charged offenses.  As an initial matter, there was no question that the movie theater was robbed, the manager was shot, and the security guard was killed.  The general manager testified that very quickly after she heard the first gunshot that fatally killed the security guard, she was shot.  In the Defendant's recorded statement, he confirmed that he was present during the robbery and that he shot the manager in the arm.  He also confirmed that Henry was present during the robbery and that Henry shot and killed the security guard. Although the Defendant insists that his recorded statement and undisputed testimony also established that he committed the offenses under duress, the jury was entitled to reject this defense as was its prerogative.  The jury could have determined that by agreeing to come to Nashville for a modeling job with Henry, someone whom the Defendant knew to have a violent past, and staying in Nashville with Henry for several days, that the Defendant did not have a well-grounded apprehension of death or serious bodily injury, see Tenn. Code Ann. § 39-11-504.  The jury also could have rejected the Defendant's defense of duress because the Defendant was at least reckless in placing himself in a situation where it was likely that he would be subject to compulsion.  Finally, based on the Defendant's own testimony, the jury could have determined that the Defendant had many opportunities to escape prior to, during, and after the offense, that he was armed during the offense, and that he was not under a continuous threat of harm.  See e.g., State v. Bargery, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *74-76 (Tenn. Crim. App. Oct. 6, 2017).  Because the jury was free to discredit the Defendant's testimony on this issue, he is not entitled to relief.

The Defendant also argues that the trial court abused its discretion by imposing consecutive sentences.  Because the trial court failed to explicitly state that the Defendant was a dangerous offender and instead said that the mandatory life sentence would be

sufficient, the Defendant urges this court to conduct a de novo review and impose a concurrent sentence. The State responds that even under a de novo review, consecutive sentencing is appropriate based on the circumstances of the offense and the Defendant's significant criminal history. We agree with the Defendant and conclude that the trial court erred in imposing consecutive sentencing in this case without stating the necessary factors on the record. However, given the fact-intensive nature of sentencing, we remand this matter to the trial court for a new hearing on consecutive sentencing.

The Tennessee Supreme Court has expanded the abuse of discretion with a presumption of reasonableness standard of review to a trial courts' decisions regarding consecutive sentencing. State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. at 862 (citing Tenn. R. Crim. P. 32(c)(1); State v. Bise, 380 S.W.3d 682, 705 (Tenn. 2012)). As relevant here, a trial court may order sentences to run consecutively pursuant Tennessee Code Annotated section 40-35-115 if the court finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4). Before imposing consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." Pollard, 432 S.W.3d at 863 (citing State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995)).

> [B]ecause the dangerous offender classification is the most subjective to apply, the record must also establish that the aggregate sentence reasonably relates to the severity of the offenses and that the total sentence is necessary for the protection of the public from further crimes by the defendant. Thus, when trial courts fail to include the two additional findings before classifying a defendant as a dangerous offender, they have failed to adequately provide reasons on the record to support the imposition of consecutive sentences.

Id. (citations omitted). When the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, this court may conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences or remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences. Id. (citations omitted).

- 8 -

Here, it is unclear the basis upon which the trial court imposed consecutive sentencing. Accordingly, we remand this matter to the trial court for consideration of the <u>Wilkerson</u> requirements in determining the propriety of consecutive sentencing.

## **CONCLUSION**

Based on the above authority and analysis, the judgments of the trial court are affirmed. However, we remand this matter for the limited purpose of determining the propriety of consecutive sentencing.

_____

CAMILLE R. MCMULLEN, JUDGE